## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **STEVE SNYDER, et al.,** | : | |
| **Plaintiffs,** | : | **Case No. 2:23-cv-2993** |
| | | **Judge Michael H. Watson** |
| **v.** | : | **Magistrate Judge Deavers** |
| **THE OHIO STATE UNIVERSITY,** | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **WILLIAM KNIGHT, et al.** | : | |
| **Plaintiffs,** | : | **Case No. 2:23-cv-2994** |
| | | **Judge Michael H. Watson** |
| **v.** | : | **Magistrate Judge Deavers** |
| **THE OHIO STATE UNIVERSITY,** | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **EDWARD GONZALEZ, et. al.,** | : | |
| **Plaintiffs,** | : | **Case No. 2:23-cv-3051** |
| | | **Judge Michael H. Watson** |
| **v.** | : | **Magistrate Judge Deavers** |
| **THE OHIO STATE UNIVERSITY,** | : | |
| **Defendant.** | : | |

**MOTION OF NON-PARTY LESLIE WEXNER FOR AN ORDER (A) QUASHING PLAINTIFFS' DEPOSITION SUBPOENA OF JANUARY 13, 2026 OR ALTERNATIVELY ISSUING A PROTECTIVE ORDER PROHIBITING SUCH DEPOSITION AND (B) AWARDING NON-PARTY ALL FEES AND EXPENSES**

Pursuant to Rules 45 and 26 of the Federal Rules of Civil Procedure, Non-Party Leslie

Wexner ("Mr. Wexner") moves the Court for an order (a) quashing Plaintiffs' deposition subpoena

of January 13, 2026 or alternatively issuing a protective order prohibiting such deposition and (b) awarding Non-Party all fees and expenses.  The basis for the motion is set forth in the attached Memorandum in support.  A proposed order is attached for the Court's consideration.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)
Lauren A. Kwapis (0106523)
Zeiger, Tigges & Little LLP
8000 Walton Parkway, Suite 260
New Albany, OH  43054
(614) 365-9900
(Fax) (614) 365-7900
little@litohio.com
kwapis@litohio.com

Attorneys for Non-Party Leslie Wexner

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Everyone agrees on one thing: there is no evidence of any kind whatsoever to suggest that Mr. Wexner has any relevant knowledge regarding Dr. Richard Strauss or his victims.

After eight years of litigation stretching back to 2018, Counsel for Plaintiffs have examined countless public documents, filed numerous detailed complaints, exchanged initial disclosures, filed numerous motions, taken and defended forty (40) depositions (including nineteen of the twenty Discovery Plaintiffs and of key players at OSU), exchanged thousands of documents produced in both the Strauss Litigation,[1] and recovered records from a separate, subpoena-enforcement-action Plaintiffs initiated against Perkins Coie, the firm that issued a lengthy, heavily-sourced report detailing Strauss's misconduct.  But, with regard to Mr. Wexner, they have come up with ***nothing***.  Not a single document, Fact Sheet, affidavit, pleading allegation, or fig leaf of cherry-picked testimony to show that Mr. Wexner has any relevant, discoverable knowledge.  Yet they demand to take his deposition anyway.

To be sure, Mr. Wexner, now 88-years-old, is a proud graduate and supporter of the University who served on OSU's Board of Trustees starting nearly 40 years ago from 1988 to 1997.  But Plaintiffs themselves have alleged a multi-decade "cover-up" ***that prevented complaints about Strauss from being reported*** "up the chain" of command.  [Compl., ¶ 514-58]  Still, they now argue their prior ***judicial admissions*** should be ignored, so they can selectively depose Mr. Wexner (but not the many other Trustees serving during this same time period) on the speculative premise

---

[1]     The "Strauss Litigation" collectively refers to <u>Gonzales et al. v. The Ohio State University</u>, Case No. 2:23-cv-03051 (S.D. Ohio), <u>Snyder-Hill et al. v. The Ohio State University</u>, Case No. 23-cv-02993 (S.D. Ohio), and <u>Knight et al. v. The Ohio State University</u>, Case No. 23-cv-02994 (S.D. Ohio).  Record citations in this memorandum refer to the filings in <u>Gonzales</u> unless otherwise noted.

that Mr. Wexner ***must*** have relevant information because, well, they assume he must.  By any measure, such sheer speculation does not suffice under Rule 45.

Even then, Plaintiffs' conjecture is nothing more than subterfuge for their true motivation: a deposition to aid their illicit, ulterior efforts.  Plaintiffs' established pattern of impermissibly waging a multi-faceted media campaign intended to foster a public frenzy and engender sympathy with the hope of materially prejudicing these proceedings is well known and, quite frankly, improper under the Rules of Professional Conduct.[2]  The seemingly endless series of extrajudicial attacks have targeted not just the University but many others, including the Wexners.

Such extrajudicial attacks make clear Plaintiffs will stop at nothing and say virtually anything.  They have publicized letters urging state and federal authorities to investigate the Wexners for purportedly facilitating the sexual assault of a woman who admits she never met the couple.  When Mr. Wexner's wife was on the Board of Trustees, they claimed the Wexners "mirrored" OSU's conduct "by permitting a culture of sexual violence and deviancy that did great damage to those in their charge."  [Exh. O, 2/7/20 Letter.]  They have claimed that the Wexners are "inextricably tied to predatory sexual abusers."  [Exh. M, 12/5/19 Letter.]  Over the last two months alone, they have staged three protests against Mr. Wexner, and now insist that even if OSU were to cut ties with the Wexners that is not enough – it must ***also*** remove anyone on its Board of Trustees associated with the Wexners.  [Exh. P, WOSU Article, 1/20/26.]  Make no mistake; if a deposition were permitted, Plaintiffs' questions would have little to do with Richard Strauss and far more to do with Jeffrey Epstein and a litany of unrelated matters.

---

[2]     Ohio Rule of Professional Conduct 3.6 prohibits attorneys from making extrajudicial statements that they reasonably should know will be widely disseminated and have a substantial likelihood of materially prejudicing a proceeding.  Furthermore, it is professional misconduct for a lawyer to knowingly assist or induce another person, including a non-attorney, to violate Rule 3.6 in the lawyer's stead.  Ohio Prof. Cond. Rule 8.4(a).

As District Judge Graham has previously held, the University's Board of Trustees is not exposed to discovery in a Title IX action merely because its members happen to be well-known donors, "business executives, civic and community leaders, and leaders in the legal community." See Waters v. Drake, 222 F. Supp. 3d 582, 607–08 (S.D. Ohio 2016) (depositions of Board of Trustees not permitted in Title IX action against OSU).[3] Nor is Mr. Wexner compelled to sit for an hours-long, unduly burdensome deposition just so that Plaintiffs can engineer yet another opportunity to harass the Wexners about unrelated matters in their attempt to add fuel for their relentless campaign to inflame public opinion.

All cases, including that of Plaintiffs, should be resolved on the facts and the law. Plaintiffs' continued media attack antics and publicity crusade should not be condoned or tolerated, and at the very least, non-parties should not be required to participate in such games. The Court should grant Mr. Wexner's Motion.

## RELEVANT FACTS AND STATEMENT OF PROCEEDINGS

### A. Plaintiffs Repeatedly Target Mr. and Mrs. Wexner.

By now, the Court is familiar with Plaintiffs' public pressure campaign against OSU, including their participation with Counsel in the HBO documentary, *Surviving Ohio State*, released in June 2025, the editorial their Counsel authored for OSU's student newspaper, *the Lantern*, issued to coincide with the documentary's release, and even Plaintiffs' intentional leak of former OSU athletic director Andy Geiger's deposition testimony to the press in violation of the Court's protective order while that deposition was still ongoing. [See Case No. 23-cv-02993, Pls' Notice

---

[3]     In Waters, the Court ordered production of Board meeting minutes and affidavits from the Board of Trustees in lieu of allowing the plaintiff to take their depositions, and did so only after the plaintiff, who alleged that OSU had terminated him in violation of Title IX, presented witness declarations and other evidence to show "that the Board of Trustees was involved in the decision to terminate Mr. Waters's employment." [See Walters v. Drake et al., Case No. 14-cv-01704 (S.D. Ohio), Plaintiff's Mtn. to Expand Discovery, ECF No. 30 at PgID#1240; Plaintiff's Request for Leave To Supp. Mtn to Expand Discovery, ECF No. 34 at PgID#1284; Order, ECF No. 42 at PgID#1474-76.]

3

of Leak, ECF No. 116; Case No. 23-cv-02991, OSU's Response & Exhibits, ECF No. 75.] These leaks continue, evidently, since there is no other explanation as to how a blogger managed to record his ambush of OSU's Counsel at the Courthouse while Counsel was appearing for mediation at a date and time the Court had kept confidential. [Exh. L, Instagram Video Images.] OSU, however, has not been Plaintiffs' only target. They have for years also used Mr. Wexner and his wife as cannon fodder for their media campaign.

Six years ago, for example, five Plaintiffs sent, and publicized to the press, a December 5, 2019 letter to Ohio's Attorney General Dave Yost, and the U.S. Attorney for the Southern District of Ohio, urging them to investigate claims by a woman who alleged she was assaulted by Jeffrey Epstein on a property he owned adjacent to the Wexner residence. [Exh. N, U.S. News Article, 12/6/19.] Although Plaintiffs acknowledged in the letter that the woman admitted to having never met the Wexners, they made the patently absurd claim that Mrs. Wexner "is as guilty as Ohio State was in facilitating the crimes of a serial sexual predator." [Exh. M, 12/5/19 Letter.]

Only two months later, Plaintiffs sent a February 7, 2020 letter to the Ohio Inspector General – which was quickly "obtained by NBC News" and reported on by other outlets – again calling for an investigation. [Exh. Q, U.S. News Article, 2/10/20; Exh. R, News Report of 02/11/20.] Though they did not address the letter to OSU, Plaintiffs evidently knew the University would receive notice of it in the press, since they expressly demanded that OSU "cleanse itself of its shameful relationships with pedophiles and sex traffickers and those who enabled them, including both Abigial and Leslie Wexner." [Exh. O, 2/7/20 Letter (emphasis in original.)]

### B. Plaintiffs Concede That Mr. Wexner Has No Relevant Documents.

In early 2024, long before they sought to take Mr. Wexner's deposition, Plaintiffs' Counsel emailed Mr. Wexner's counsel a subpoena *duces tecum* seeking a broad array of documents

purportedly relevant to the Strauss Litigation. [Exh. A, 2024 Records Subpoena.] Under "Schedule A" to that 2024 Records Subpoena, Plaintiffs requested that Mr. Wexner produce "[a]ll communications": "between You and anyone affiliated with" Perkins Coie LLP, or OSU "concerning Dr. Richard Strauss, the Perkins Coie Investigation, or the Perkins Coie Report"; "between You and Dr. Richard Strauss"; and "all communications and documents concerning Dr. Richard Strauss, the Perkins Coie Investigation or the Perkins Coie Report, the [Strauss Litigation], or any of the Plaintiffs." [Id.]

Mr. Wexner's counsel responded to Plaintiff's Counsel by email and objected to the 2024 Records Subpoena as improperly served under Rule 45(b)(1). Without obligation to do so, he otherwise "confirm[ed] that Mr. Wexner is not in possession or control of any documents that are responsive to the subpoena and that no documents are being withheld on the basis of the above-stated objection." [Exh. B, 3/13/24 Letter.] Now, almost two years later, Plaintiffs still do not dispute that Mr. Wexner has no responsive documents—nor do they or the University have any documents demonstrating that Mr. Wexner has any discoverable information.

### C. The Court Questions What Relevant Information, If Any, Mr. Wexner Might Have During An April, 2024 Status Conference.

The parties discussed third-party discovery, including Plaintiffs' interest in Mr. Wexner, during an April 1, 2024 telephonic status conference. [Case No. 23-cv-02991, ECF No. 27.] In response to inquiry from the Court, Plaintiffs' stated basis for taking discovery from Mr. Wexner was limited to the following grounds, each of which, of course, turned out to be completely ***false***:

> MS. GREENBERGER: My understanding is -- you mean why do we want information from him? … Because my understanding is that he has been very involved in the communications about OSU's response. He was also on the board at the time or heavily involved at the time when the Strauss allegations came forward.
>
> THE COURT: Okay.

MS. GREENBERGER: And I think that it is very likely that he consulted how to handle the Strauss allegations both when they came forward in the '90s and more recently in 2018. [Id. at PgID#476-77.]

**D.    After Another Eighteen (18) Months Of Litigation And Discovery, None Of Which Yielded Any Suggestion That He May Have Relevant Information, Plaintiffs Seek Mr. Wexner's Deposition But Refuse To Explain The Grounds For Their Request.**

On September 5, 2025, Plaintiffs' Counsel requested that Mr. Wexner's counsel accept service of a deposition subpoena "since you previously accepted service of our document subpoena." [Exh. K 9/5/25 Email.][4] Mr. Wexner's counsel responded by letter on September 10, 2025. [Exh. C, 9/10/25 Letter.] He noted at the outset that Plaintiffs' Counsel misrepresented the facts concerning the 2024 Records Subpoena, for which Mr. Wexner's counsel had ***declined*** to accept service, and then asked why Plaintiffs needed to take Mr. Wexner's deposition:

> It is unclear why you are seeking Mr. Wexner's deposition in this matter. We have no reason to believe the University has identified him as a witness and otherwise do not believe he has any personal information relevant to the claims or defenses. Presumably his deposition is not being sought as a designee of the University since Rule 30(b)(6) prescribes the mechanism for securing such testimony. [Id.]

Counsel added that "[i]f there are any documents or testimony suggesting our understanding is incorrect, please advise so that we can assess how best to respond to your inquiry." [Id.] Plaintiffs' Counsel never provided any.

Having not heard back from Plaintiffs' Counsel for more than two weeks, Mr. Wexner's counsel took the initiative and followed up in a September 26, 2025 email. [Exh. D, 9/26/25 Email.] Again he asked why Plaintiffs believed Mr. Wexner had any relevant information:

---

[4]    The correspondence between Mr. Wexner's counsel and Plaintiffs' Counsel demonstrates that Mr. Wexner's counsel exhausted all extrajudicial means of resolving this dispute before filing the instant motion as required under Local Rule 37.1. Additionally, Mr. Wexner's attorney Marion H. Little certifies in his accompanying declaration that Mr. Wexner's counsel have conferred with Plaintiffs' Counsel in good faith in an effort to resolve this dispute without court action. Fed.R.Civ.P. 26(c)(1). [Exh. X, M. Little Decl. at ¶ 15-16.]

I am again following up on my attached letter. Despite it being sent two weeks ago, we have received no response.

If you are still requesting Mr. Wexner's deposition, we would again renew our request, as stated in my letter, that you please identify what discoverable information you believe Mr. Wexner possesses so we can consider your request.

Plaintiffs' Counsel replied that she "would be happy to engage in this discussion and further explain our position," but only if counsel would first "agree to accept service of the subpoena for Mr. Wexner." [Exh. E, 9/29/25 Email.] Troubled by Plaintiff's unwillingness to explain the request, Mr. Wexner's counsel rejected her conditional offer:

We are willing to consider your request if you can articulate how Mr. Wexner has personal knowledge of any information that would be discoverable in your case. The unwillingness, or inability, to articulate any personal knowledge you believe he has furthers our concern that this deposition is being sought for improper purposes.

As we have been saying for the past month, we are more than willing to consider your request but do need to understand the basis for it. [Exh. F, 10/1/25 Email.]

E.      **After A Month Of Back-And-Forth Exchanges, Plaintiffs At Last Explain Why They Want To Take Mr. Wexner's Deposition: Because They Speculate That He Has Some Relevant Knowledge That He Doesn't Actually Have.**

On October 6, 2025, Plaintiffs' Counsel emailed counsel and offered the following:

Mr. Wexner was on the Board of Trustees during at least a decade of Strauss' tenure (including when he was ultimately non-renewed and allowed Emeritus status), is one of OSU's largest donors, and probably interacted in other ways with Dr. Strauss and those who were sexually assaulted. If you contend that Mr. Wexner has no knowledge of Dr. Strauss or any his victims, and the investigation that ensued, then we might consider an affidavit. Otherwise, we would ask that you accept service, and let's pick a date. … [Exh. G, 10/6/25 Email.]

Mr. Wexner's counsel replied, pointing out the deficiencies in Plaintiffs' explanation:

Based upon our review of the publicly available information pertaining to this case, we cannot discern how Mr. Wexner's generosity as a donor or his Board membership during the time frames 1988 to 1997 and 2005 to 2012 suggests that Mr. Wexner has discoverable information. From the materials reviewed, it was March 2018 when Ohio State received a report of sexual abuse by Richard Strauss; it was April 5, 2018, when Ohio State announced an investigation and notified to

7

the Columbus Division of Police, and it was on May 17, 2019, that Ohio State issued the Perkins Coie Report.

We presume the discovery in the litigation has been exhaustively pursued against the University, both through extensive document collection and review and depositions. It has been publicly reported that various non-parties have also been deposed. If there is any information you possess suggesting the aforementioned timeline is inaccurate, please provide it to us for our evaluation.

We add that the University has not, to our knowledge, designated Mr. Wexner in any Rule 26 disclosure as a person possessing knowledge relevant to this litigation and has not otherwise identified Mr. Wexner as a witness. … [A]s of now, no information from any source suggests Mr. Wexner has relevant information--nothing from the Defendant, Plaintiff, and/or any publicly filed record.

Given the foregoing, we are interested as to the basis for your claim that Mr. Wexner "probably interacted in other ways with Dr. Strauss and those who were sexually assaulted." What is your basis for this comment? We know of no interaction between Mr. Wexner and Dr. Strauss or those who have made allegations of sexual assault. If you have any factual basis for your belief, we will review it. Otherwise, it is unclear as to what proper purpose your seeking Mr. Wexner's deposition or an affidavit serves. [Exh. H, 10/10/25 Letter.]

Plaintiffs' Counsel offered no explanation in response.

F.     **Plaintiffs Move The Court For An Order Permitting Alternative Service On Mr. Wexner, Despite Admitting There Is Not "A Single Piece Of Written Documentation" Showing That He Has Any Knowledge "Of Strauss Or The Investigation Into Strauss' Sexual Abuse Of Students."**

On November 19, 2025, Plaintiffs filed a motion requesting alternative service on Mr. Wexner. [ECF No. 144, PgID#1663.] The motion offered no evidence whatsoever, let alone evidence that Mr. Wexner possessed any discoverable information. Rather, Plaintiffs merely argued that given his proximity to OSU, as a "benevolent" donor and member of OSU's Board of Trustees from 1988-1997, Mr. Wexner must have personal knowledge of Strauss, his victims, or OSU's investigation into the matter. Again they speculated: "It defies all logic and reason that Mr. Wexner would not have any knowledge about Strauss and his victims." [Id. at PgID#1664.]

But Plaintiffs forget that their own allegations supply that logic, for they contend that OSU employees "didn't report Strauss up the chain" due to an "*Extensive Institutional Cover-up.*" [Compl. at ¶ 515, Subheading F.]  Specifically, Plaintiffs allege:

> When given the opportunity to depose six (6) former OSU doctors who worked side-by-side with Strauss, the same overarching theme revealed itself:  ***the culture at OSU was to protect Strauss*** and keep students – and Strauss's colleagues – in the dark about his dangerous proclivities.  [Id. at ¶ 514.]

> Physician after physician testified that he was never informed by his predecessor, supervisor, or colleagues in other departments about the onslaught of complaints lodged by students about Strauss.  [Id. at ¶ 515.]

> Once these doctors heard the concerns themselves, firsthand … ***they didn't report Strauss up the chain***, they didn't investigate students' reports, they didn't discuss Strauss's sexually deviant behavior with other students or staff, they didn't report Strauss to the medical board or local authorities.  [Id. at ¶ 516.]

> Lombardo testified that he never had any discussions with any OSU medical staff to inquire about Strauss, never informed athletic directors Andy Geiger or Jim Jones that Strauss was perpetually showering with student-athletes, never inquired with a single student or athletic trainer, about Strauss and ***never reported Strauss to any other OSU official***.  [Id. at ¶ 519.]

> [T]he OSU doctors deposed all testified that ***the cloud of deception about Strauss's ability to appropriately practice medicine in the athletics department hung over all the other OSU medical departments as well***.  [Id. at ¶ 525.]

> Doctors John Lombardo, Ted Grace, and Roger Miller all similarly testified that they did not share any information about Strauss with one and other, despite the fact Strauss was actively treating innocent students while clear indicators of his dangerous proclivities swirled throughout campus.  [Id. at ¶ 526.]

> ***Keeping information about Strauss shrouded in secrecy was the status quo at OSU***, as confirmed by Grace's deposition, where he testified that prior to his investigation into Strauss in 1996, he had never been told by the Athletics Department staff, athletics coaches or student trainers of the dozens of allegations about Strauss in their department that had been present for years or that Strauss had been relieved of his wrestling team physician duties. [Id. at ¶ 528.]

> It was a ***widespread and intentional culture of silence, cover-up, and deliberate indifference to sex crimes***. When confronted with reports of Strauss's behavior, officials either accepted his explanations and moved on, or ignored the reports because they ***didn't know how to escalate them***. [Id. at ¶ 558 (emphasis added.)]

Despite conceding that there are "zero letters, text messages, emails, or any documents" connecting Mr. Wexner to Strauss or his victims and judicially admitting Strauss' conduct was not escalated to a higher level,[5] Plaintiffs offered the circular argument that the ***total lack of evidence*** that Mr. Wexner has any relevant personal knowledge shows that he ***must*** have such personal knowledge. [ECF No. 144 at PgID#1664-65.] Tellingly, Plaintiffs did not, nor could they, reiterate their claim to the Court that Mr. Wexner was aware of any allegations against Strauss in the 1990's or that he consulted with OSU regarding Strauss in recent years.

>        G.      **While Plaintiffs Continue Their Publicity Campaign Against Mr. Wexner, OSU Confirms Mr. Wexner's Counsel Is Correct: There Is No Indication That He Has Any Relevant Personal Knowledge.**

Plaintiffs' Counsel emailed a filed version of the motion for alternate service to Mr. Wexner's Counsel on December 4, 2025, again asking them to accept service on his behalf. [Exh. I, 12/4/25 Email.] Her email coincided with another publicity effort by Plaintiffs, who protested an OSU Board of Trustees meeting that same day, intending to put "pressure" on attorney John Zeiger, who chaired the meeting. [Exh. S, WOSU Article, 12/4/25.] "This time, the group held up signs asking 'Where's Wexner' and displayed images of Wexner and convicted sex offender Jeffrey Epstein." [Id.] A reporter for WOSU 89.7 who quoted one of the Plaintiffs falsely stated under a photo of Plaintiffs at the meeting that Mr. Wexner was "defying subpoenas" even though none had ever been served on him and Mr. Wexner's counsel actively attempted to work with Plaintiffs' counsel. [Id.][6]

---

[5]      Plaintiffs are bound by their allegations "because factual assertions in a pleading are binding on the party who made them." Harding v. Transforce, Inc., 2012 WL 628747, *6 (S.D. Ohio Feb. 27, 2012); Davis v. LifeTime Cap., Inc., 740 F. App'x 820, 832 (6th Cir. 2018).

[6]      Mr. Wexner cannot have been "defying" any subpoenas because "only disobedience of a properly served subpoena can lead to a sanction," and no subpoena was ever properly served.  Shulman v. Amazon.com.KYDC LLC, 2014 WL 4103528, *12 (E.D. Ky. Aug. 15, 2014); Bricker v. R & A Pizza, Inc., 2011 WL 3941982, *3 (S.D. Ohio Sept. 6, 2011).

Mr. Wexner's counsel responded on December 10, 2025, again declining service, explaining Plaintiffs' motion still failed to state any grounds for deposing Mr. Wexner. He also expressed dismay that Plaintiffs sought Mr. Wexner's deposition only "to further contribute to the media frenzy created by impermissible extrajudicial statements, the improper disclosure of confidential information, and various other media stunts." [Exh. J, 12/10/25 Letter.]

OSU filed a memorandum contra to Plaintiffs' motion for alternate service on December 10, 2025. [ECF No.146 at PgID#1714-17.] The University explained that Mr. Wexner's counsel was correct: there is no evidence that he has any personal knowledge relevant to the Strauss matter.

> Ohio State has not identified Mr. Wexner as a witness in this litigation, and none of the complaints in the litigation, none of the Discovery Plaintiffs' fact sheets, none of the responses or documents produced by any of the parties in response to discovery requests, and none of the depositions taken to date contain any specific allegations, testimony, or information suggesting that Mr. Wexner interacted with Strauss or possesses any information regarding any plaintiff's alleged interactions with Strauss. [Id. at PgID#1715-16 (footnote omitted.)]

Plaintiffs did not assert otherwise in their Reply memorandum. They merely contested the University's standing to challenge a subpoena served on a non-party even where no legitimate basis exists for the discovery and it is interposed for illicit, ulterior purposes. [ECF No. 147.]

With their motion still pending, Plaintiffs staged another on-campus protest targeting Mr. Wexner at the Woody Hayes Athletic Center on December 17, 2025. [Exh. T, NBC 4 Article, 12/17/25; Exh. U, U.S. News Article, 12/17/25.] Holding signs that said "Woody or Wexner," Plaintiffs demanded that OSU remove Mr. Wexner's name from Les Wexner Football Complex, which is part of the Athletic Center. [Exh. T.] One Plaintiff who spoke to the press admitted the protest was intended to assert leverage in the Strauss Litigation: "Wexner's name should not be on the Les Wexner football complex because he continues to defy subpoenas from lawyers

representing students who are suing Ohio State for not protecting them from Strauss, and because of his association with Epstein." [Exh. U.]

Ultimately, the Court granted Plaintiffs' motion for alternate service but without endorsing their claim that Mr. Wexner must have some relevant, personal knowledge. [ECF No. 150.] Only a week later, Plaintiffs staged a third protest against Mr. Wexner at the Hayes Athletic Center. Adding to their demand that OSU remove Mr. Wexner's name from its facilities, Plaintiffs now claimed that because of their association with Mr. Wexner, his attorney, John Zeiger, and Elizabeth Kessler, the daughter of Mr. Wexner's longtime friend and business associate Jack Kessler, were not fit to remain on OSU's Board of Trustees either. [Exh. P, WOSU Article, 1/20/26.]

## LAW AND ARGUMENT

A. **The Court Should Grant Mr. Wexner's Motion To Quash And For A Protective Order Because The Deposition Imposes An Undue Burden, Is Sought For An Improper Publicity-Generating Purpose, And The Information Sought Is Already Available From, And Produced By, Parties To The Strauss Litigation.**

"Federal Rule of Civil Procedure 45 permits litigants to obtain discovery from nonparties via subpoena while simultaneously protecting nonparties from excessively onerous requests for information." Lyons v. My Pillow, Inc., 2023 WL 8450724, *2 (6th Cir. Dec. 6, 2023). Those protections are two-fold: First, "[t]he issuing party 'must take reasonable steps to avoid imposing undue burden or expense' on the subpoena recipient." United States v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n, 727 F. App'x 119, 123 (6th Cir. 2018). Second, Rule 45 "mandates" that the Court "must modify or quash a subpoena that … subjects a person to undue burden." Lyons, 2023 WL 8450724 at *2.

Separately, "[t]he Court has the duty to deny discovery directed to matters not legitimately within the scope of Rule 26, and to use its broad discretionary power to protect a party or person from harassment or oppression that may result even from a facially appropriate discovery request."

12

Maas v. JTM Provisions Co. Inc., 2025 WL 815431, *5 (S.D. Ohio Mar. 13, 2025).  Further, the Court "must limit" discovery if it concludes the information sought "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient" or "less burdensome."  Fed.R.Civ.P. 26(b)(2)(C)(i).  And in considering the burdens imposed, non-party status always "weighs against disclosure."  Marquinez v. Dole Food Co. Inc., 2021 WL 122997, *6 (S.D. Ohio Jan. 13, 2021).  Under both Rule 26 and 45, no deposition should be permitted.

**B.      What This Subpoena Is *Not* About: Discovering Relevant, Probative Evidence Concerning The Merits Of The Strauss Litigation.**

**1.      Not A Single Document, Witness, Fact Sheet, Communication, Or Other Record Links Mr. Wexner To Strauss Or His Victims.**

*<u>First</u>*, Magistrate Judge Deavers has taken Plaintiffs to task once already for wasting time on unproductive "distraction[s]" and "side issue[s]" and for their tendency to "cavalierly dismiss the idea that third-party witnesses may have their own set of privacy concerns."  <u>See</u> <u>In re Subpoena to Perkins Coie, LLP</u>, Case No. 19-mc-38, Opinion & Order, ECF No. 96 at PgID#672-76.  Given the total dearth of evidence suggesting that he has any relevant, personal knowledge concerning Strauss, however, it is clear that Plaintiffs' demand to question Mr. Wexner is merely another high-profile "distraction" with no possibility of turning up any probative information.

OSU, for instance, has published every source document cited in the Perkins Coie Report online and it produced nearly 40,000 pages of documents to Plaintiffs in discovery, including 17,500 pages of records in response to requests related to the Perkins Coie investigation.  [Case No. 23-v-2993, OSU's Memo Contra Mtn. to Compel, ECF No.139 at PgID#2526-28.]  Perkins Coie produced an additional 14,500 pages to Plaintiffs  pursuant to a court order in a separate case, which included memoranda of witness interviews.  [<u>Id.</u> at PgID#2529; <u>see also</u> Case No. 19-mc-38, Order, ECF No. 89 (ordering production.)]  Nearly three hundred (300) Plaintiffs have

completed Fact Sheets identifying persons with whom they communicated about Strauss and produced all records of those communications. [Fact Sheet, ECF No. 37-1, PgID#1645-55.] And as OSU stated, the parties have taken the depositions of forty (40) witnesses, including 19 Discovery Plaintiffs. [Memo Contra Mtn. for Alt. Serv., ECF No.146 at PgID#1716 n.1.]

Still, Plaintiffs have nothing to justify their suspicion that Mr. Wexner "probably interacted … with Dr. Strauss and those who were sexually assaulted." Third-party depositions are not "fishing" expeditions and "prohibiting the deposition of a witness who has no personal knowledge of the events or investigation underlying the case and who cannot provide relevant testimony is appropriate." Anwar v. Dow Chem. Co., 876 F.3d 841, 854 (6th Cir. 2017) (cleaned up).

### 2. Plaintiffs Attempt To Manufacture Relevance By Misrepresenting Mr. Wexner's History On The Board Of Trustees.

**_Second_**, Plaintiffs represented to this Court that Mr. Wexner is likely to have relevant information because he was "Board of Trustees' President" when the University "allowed [Strauss] to retire with honor." [Pls' Reply, ECF No. 147 at PgID#1723.] That's false.

As detailed in the Perkins Coie report, the Board of Trustees decided on Strauss's Emeritus status in 1998. [Rpt. at 33, 154, 154 n.559.] Mr. Wexner was not on the Board in 1998. Rather, he served on the Board from 1988 to 1997.[7] The publicly-available meeting minutes from the March 6, 1998, Board of Trustees' meeting wherein the Board awarded Strauss the Emeritus title show that Mr. Wexner was not present – a fact Plaintiffs could have easily confirmed with a basic google search before telling the Court otherwise.[8]

---

[7] See List of Former Trustees, https://trustees.osu.edu/university-board/former-trustees (last visited Jan. 20, 2026). Mr. Wexner also served on the Board of Trustees from 2005 to 2012, well after Strauss's 1998 retirement, with the bulk of that term occurring after Strauss's death in August, 2005. [Rpt. at 26 n.52, 28.]

[8] See Official Proceedings of the One Thousand Three Hundred and Fortieth Meeting of the Board of Trustees, Columbus, Ohio, March 6, 1998, available at https://kb.osu.edu/server/api/core/bitstreams/315bd28b-87b6-503f-9ed2-9ebb2cd292b0/content (last visited Jan. 20, 2026).

As for Strauss's non-renewal in 1996, it was not the Board of Trustees, but OSU's administrators, including the University's then Vice President of Student Affairs and Associate General Counsel for Human Resources, who investigated the complaints against him, conducted the closed disciplinary hearing, and decided not to renew his appointment with Student Health Services. [Rpt. at 137, 145-150.] If Plaintiffs suspect the Board had some involvement that Perkins Coie overlooked, they could consult the hundreds of pages of meeting minutes reflecting Board's activities for every meeting held between 1995, and 1997, all of which are available on the University's website.[9] [See https://kb.osu.edu/handle/1811/50098 (last visited Jan. 20, 2026).]

But Plaintiffs have never cited any Board-related (or for that matter, other) materials remotely suggesting that Mr. Wexner has any knowledge of Strauss or his victims as a result of his Board position. That they instead resorted to misrepresenting readily verifiable facts should give the Court pause in deciding whether Mr. Wexner's deposition should go forward. See Mitchell v. Arnold, 2023 WL 7711478, *5 (W.D. Ky. Nov. 15, 2023) (where plaintiffs failed to provide factual support for their claim that he had relevant information, "subjecting the former mayor to a deposition appears to serve no other purpose than to harass, annoy, or unduly burden him.").

**3. Plaintiffs' Unexplained Desire To Take Mr. Wexner's Deposition, And Not That Of Any Other Trustee Who Was On The Board During The Same "Critical Period," Exposes Plaintiffs' Illicit Ulterior Motive To Attract Pretrial Publicity.**

*Third*, Plaintiffs' focus on Mr. Wexner alone, to the exclusion of other Trustees who were also on the Board during this "critical time period of Strauss's serial sexual abuse" raises further questions concerning their true motive. [Pls' Mtn. at PgID#1663-64.] Indeed, Plaintiffs' claim that

---

[9] The period between 1995 and 1997 is significant because students A, B, and C complained about Strauss between January, 1995, and January, 1996, leading to OSU's investigation and its decision not to renew his appointment with Student Health Services. [Rpt. at 2, 37, 116-150.] Any mentions of Strauss in the meeting minutes after 1997 are irrelevant to Plaintiffs' deposition request because Mr. Wexner was no longer on the Board after 1997. Our own review of these minutes using a word search for Strauss's name did not yield a single reference to Strauss.

Mr. Wexner has a "long illustrious history" with the University as a supporter and donor is equally true of others who served on the Board during the very same "critical" period.

Alex Shumate, for example, is a well-respected OSU graduate and senior partner at Squire Patton Boggs[10] who served on the Board of Trustees between 1989 and 1998, at roughly the same time as Mr. Wexner. See n.7 (website listing former OSU trustees). Unlike Mr. Wexner, however, he was on the Board during the March 6, 1998, meeting at which Strauss was awarded Emeritus status. Fellow Board member and former CEO of the Longaberger Company, Tamala Longaberger, who served from 1996 to 2005, was also at that March 4, 1998, meeting. Similar to the Wexners, Ms. Longaberger's family and charitable foundation have made significant contributions to the University.[11] The Hon. Theodore Celeste, a former member of the Ohio House of Representatives and brother of Governor Richard Celeste, was also present at the March 6, 1998, meeting as part of his term on the Board from 1990 to 1999.[12]

Nevertheless, it appears from the docket that Plaintiffs have never attempted to secure any documents, affidavits, or deposition testimony from any other Board member whose tenure overlapped with Strauss's employment, and who were on the Board for the Emeritus award. For some still-unarticulated reason, it is only Mr. Wexner, who Plaintiffs have urged the state and federal government to investigate, with whom Plaintiffs insist that OSU must disassociate, and against whom Plaintiffs have protested multiple times, that Plaintiffs want to interrogate. The reason why is obvious: it is only Mr. Wexner's name that guarantees Plaintiffs media attention.

---

[10]  See https://www.squirepattonboggs.com/our-people/alex-shumate/ (detailing Mr. Shumate's professional accomplishments) (last visited Jan. 20, 2026.)

[11]  See https://library.osu.edu/site/buckeyestroll/longaberger-alumni-house/ ($2 million gift to finance the Longaberger Alumni House) (last visited Jan. 20, 2026); see also https://news.osu.edu/longaberger-foundation-gives-5-million/ (the Longaberger Foundation of Newark announces $5 million donation) (last visited Jan. 20, 2026.)

[12]  See https://ballotpedia.org/Ted_Celeste (last visited Jan. 20, 2026.)

Plaintiffs use of Mr. Wexner's deposition "as an oppressive bargaining chip" for an illicit, ulterior purpose is improper and the Court should quash the subpoena. <u>Serrano v. Cintas Corp.</u>, 699 F.3d 884, 902 (6th Cir. 2012); <u>see</u> <u>also</u> <u>Lewelling v. Farmers Ins. of Columbus, Inc.</u>, 879 F.2d 212, 218 (6th Cir. 1989) (affirming protective order against plaintiffs' notice to depose defendant's board chairman where he "had no knowledge as to [the relevant] facts" and plaintiffs offered "to cancel the deposition request if [the chairman] would agree to meet with plaintiffs" for settlement).

**C.** **What This Subpoena _Is_ About: Unduly Burdening Mr. Wexner With Duplicative Inquiries For Information Available From Other, More Convenient Sources And Harassing Him To Garner Media Attention.**

As part of their duty to protect third parties from undue burden and limit duplicative discovery, "courts routinely quash subpoenas directed to non-parties where the discovery sought was obtainable from a party to the litigation." <u>McGlone v. Centrus Energy Corp.</u>, 2020 WL 4462305,*4 (S.D. Ohio Aug. 4, 2020) (Deavers, M.J.); <u>see</u> <u>also</u> <u>Maas</u>, 2025 WL 815431 at *8 ("Plaintiffs have not provided a convincing reason for this Court to sanction the _extraordinary_ course of action of issuing a subpoena for deposition testimony and the production of protected documents from a non-party to the case—especially where such information can be made available from Defendants themselves.") (Emphasis in original.) The information Plaintiffs' Counsel purportedly seeks from Mr. Wexner in this case is available both from OSU and **_their own clients_**.

**1.** **Whether Mr. Wexner "Probably Interacted … With Dr. Strauss And Those Who Were Sexually Assaulted": Evidence Produced To Date By Plaintiffs And OSU Already Provides The Answer.**

Discovery requests to third parties, including for deposition testimony, are unduly burdensome and unreasonably duplicative where the party seeking the information can obtain it from a party to the action. <u>E.g.</u>, <u>Pizzuti v. Nashville Hosp. Cap., LLC</u>, 2018 WL 5303061, *4–5

(S.D. Ohio Oct. 25, 2018) (Deavers, M.J.). Plaintiffs' demand to take Mr. Wexner's deposition is duplicative and unduly burdensome for the same reason.

Here, Plaintiffs' Counsel does not need to ask Mr. Wexner whether, at some point over the last forty years, he "interacted" with any of Strauss's hundreds of victims (who were not even identifiable as such) because their own clients would have told them so already. Again, Plaintiffs completed Fact Sheets identifying persons with whom they shared information about their interactions with Strauss and produced all documentation of those communications. Surely, Counsel not only reviewed that information, ***but prepared and produced it to the University***. Moreover, the Court has stayed discovery "in all cases but the Discovery Plaintiffs' cases." [Case Mgmt. Order, ECF No.105 at PgID#1377.] And the parties have already conducted depositions of (19) of the twenty (20) Discovery Plaintiffs. If any of them interacted with Mr. Wexner, Plaintiffs would know by now.

As for any "probable" interactions with Strauss, Plaintiffs have already requested from OSU, and it appears that OSU has already produced, "[a]ll documents concerning Dr. Richard Strauss," which includes dozens of letters exchanged by Strauss. [See Case No. 23-cv-2993, Exh. A to Pls' Mtn to Compel, ECF No. 135-1 at PgID#2490-99.] More to the point, Mr. Wexner declares that he has never communicated with Strauss through any medium. [Exh. W, L. Wexner Decl., at ¶ 4.] Plaintiffs are not "entitled to test the memories of all witnesses" when they already have the information they want readily at hand through OSU. Pizzuti, 2018 WL 5303061 at *4; In re CareSource Mgmt. Grp. Co., 289 F.R.D. 251, 253–54 (S.D. Ohio 2013) ("[T]he Court will not impose on non-party CareSource the burden of producing documents that are apparently available … from HMS.").

      **2.**      **Even If There Were Any Relevant Communications With OSU - And There Are Not - Plaintiffs Could Secure Them Directly From OSU.**

Implicitly conceding the falsity of the assertion, Plaintiffs abandoned in their motion for alternate service their prior representation to the Court that OSU "consulted" Mr. Wexner regarding the "Strauss allegations," including in the 1990's.  But even if they still claimed as much, Plaintiffs have already sought evidence reflecting those communications from OSU in discovery.  [See Case No. 23-cv-2993, Exh. A to Pls' Mtn to Compel, ECF No. 135-1 (RFPD Nos. 1, 3, 7, 10-15); see also OSU's Memo Contra, ECF No. 139 at PgID#2529 (Plaintiffs seek "All communications … between Ohio State and any external party" advising Ohio State on "public relations, reputational management and/or crisis management," and "All communications within Ohio State or between Ohio State and anyone concerning the Perkins Coie investigation".)]  Plus, Mr. Wexner has no recollection "of any discussion" about Strauss or any investigation.  [L. Wexner Decl., at ¶ 6.]

Plaintiffs have also taken the depositions of twenty-one OSU witnesses, including numerous employees, during which they had ample opportunity to inquire about their outside communications concerning Strauss and OSU's investigation. [Case No. 23-cv-2993, Notices of Depositions Taken, ECF Nos. 118, 121, 132 136.]  There is no reason to burden a third-party with questions about decades old communications under these circumstances.  See Duncan v. Husted, 2015 WL 631103, *4 (S.D. Ohio Feb. 12, 2015) (granting motion to reconsider protective order where "Defendant has amply demonstrated here that it is … Mr. Damschroder, rather than Secretary Husted himself, will be able to answer the questions which Plaintiff wishes to ask").[13]

That Plaintiffs' document requests to OSU for the same information are currently subject to a motion to compel does not change matters.  A protective order is required if "the discovery

---

[13]     See also Petty v. Bluegrass Cellular, Inc., 2021 WL 1235266,*7 (W.D. Ky. Apr. 2, 2021), objections overruled, 2022 WL 759538 (W.D. Ky. Mar. 10, 2022), aff'd, 2023 WL 2754253 (6th Cir. Jan. 10, 2023) (protective order granted where movant "provides not just reasons why Ron Smith lacks relevant testimony that could be obtained through other avenues, but also … that the proposed depositions would be for the purpose of harassing, annoying" the movant, as the requesting party sought "duplicative testimony that she had ample opportunities to obtain").

sought … *can be obtained from some other source that is more convenient, less burdensome, or less expensive*," Duncan, 2015 WL 631103 at \*4 (emphasis in original), regardless of whether such discovery actually *is* obtained from another, more convenient source.  See StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc., 2015 WL 1022083, \*2 (N.D. Ohio Mar. 9, 2015) (refusing to circumvent magistrate's prior order denying motion to compel by giving Defendants "a second bite at the apple" to request the same information "through the use of a third-party subpoena.").

> **3.      Mr. Wexner Has Shown Good Cause For A Protective Order Based On Plaintiffs' Documented History Of Targeted Harassment And Continued Efforts To Generate Favorable Pretrial Publicity Even If They Must Violate This Court's Orders To Do So.**

Weighing the considerations in this case is not a close call.  On one hand, there is nothing.  No evidence suggests Mr. Wexner has any relevant personal knowledge, no evidence that Plaintiffs have directed good faith, third-party discovery to any other Board of Trustees members, and no anticipated testimony or information unique to Mr. Wexner which they have not already obtained (or cannot obtain) from parties to the Strauss Litigation.  On the other hand, there's plenty.  Evidence that Plaintiffs have been decrying the Wexners' association with OSU since at least 2019, that they have accused the Wexners of criminal liability for Jeffrey Epstein's heinous acts, that they have "cavalierly" disregarded the rights of witness deponents, including by intentionally leaking their testimony to the press, and have invoked Mr. Wexner's name in protest whenever necessary to rouse public opinion against the University.  And such "specific facts show[] good cause to forbid the deposition from going forward." Pizzuti, 2018 WL 5303061 at \*4.  Finally, the Court "must enforce" Plaintiffs' obligation to avoid imposing an undue burden on Mr. Wexner as a nonparty through "an appropriate sanction" of attorney's fees.  Fed.R.Civ.P. 45(d)(1).

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Wexner's Motion.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)
Lauren A. Kwapis (0106523)
Zeiger, Tigges & Little LLP
8000 Walton Parkway, Suite 260
New Albany, OH  43054
(614) 365-9900
(Fax) (614) 365-7900
little@litohio.com
kwapis@litohio.com

Attorneys for Non-Party Leslie Wexner

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system this 27th day of January, 2026, which will send notification of such filing to all attorneys of record.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.  (0042679)

1075757

21